Madam Clerk, please call the next case. 115-1300, Flexible Staffing Services v. Frederick Lewis. Counsel, you may proceed. Thank you. May it please the Court, Counsel. I'm Kathleen Hobson, attorney on behalf of Flexible Staffing Services. In this case, we're raising the issue of whether or not the Commission misinterpreted Section 8.1, subsection B, 8.1B, subsection B, or subparagraph B, when it considered each factor that's listed in subparagraph B, whether or not the factor was related to the level of disability. Counsel, let me ask a threshold question. You've argued in your brief that the Commission misapplied Section 8.1B as a matter of law because it considered factors for which there was no evidence in the record. Why has an alleged deficiency in the record created a question of law as opposed to a mere manifest way to the evidence issue? I think that as the Court has started to interpret the Section 8.1B, there's been an evolution in continental tire. The Court specifically has language in the opinion that every single factor is to be considered. Of course, in that case, the issue is whether or not there was the PPD, whether or not the claimant had to bring in the PPD impairment report. And so the Court said that every single factor had to be considered. And then recently, the Corn Belt Energy case came out. And in that case, there was no PPD impairment report at all. And there was a discussion as to whether or not you need to consider every factor. And in that case, it was said that you do not need to have the PPD impairment report since it's one of the factors. Therefore, you don't need to have every single factor considered. Well, you have to consider every factor for which there is evidence in the record. But whether there is evidence to support a factor is a question of fact, not a law. Well, I think the other portion of that is that the Commission now has the mandate within Section 8.1B of what it has to follow in order to make that PPD determination. So if they're not following what those mandates are, then you're not just looking at whether there's a question of fact. You're looking at whether the mandates are being followed. Do you think they cannot consider anything other than those factors? I do not. You don't think they can consider anything other than those factors? The statute says that in determining the level of permanent partial disability... Consider the PPD report along with these factors. But it doesn't say those factors are exclusive, does it? Yeah, I believe when you have a list in a statute that those are the only items... Does it say only? Where in the statute does it say only? That you shall consider these factors in determining the level of disability, the relevance and weight of any factor used in addition to the level of impairment. So I think they're looking at making... But it doesn't say only, does it? The statute does not say only, does it? It does not have the word only in it. Okay. Thank you. So I think that this case fits in with how the decisions are coming out in this. At first, the court is saying that you need to consider all the factors and if there's not a PPD impairment report, that you do not have to have that in order to make the PPD determination. And in this case, what I'm looking at is then when you're looking at all of these factors, what does section 1.1 subsection E mean for PPD determination? And that section 1.1 was also an added section in the 2011 amendments, and that one requires that every decision shall be based exclusively on evidence in the record of the proceeding and material that's been officially noticed. And so in this specific case, I think that you have a situation where some of these factors, there is assumptions of what the evidence is rather than what the evidence... What are those factors that you're alleging there were assumptions of? The third factor, age. The commission found that the petitioner will live longer with his disability than someone who is older. There is actually no specific evidence in the record as to how long the petitioner will live, that he will actually live longer with a disability. Can I ask another question? The factors that the commission is to consider in addition to the report are his occupation. Is that correct? Yes. His age. Yes. The employee's future earning capacity. Yes. And the evidence of disability corroborated by the treating medical records. Yes. Is there anything else in that list that they're to consider? No, Your Honor. And your position is they shouldn't consider anything else, should they? Correct. Okay, so they should never consider a defense IME report that says that his disability is not what his treating physicians say it is. I'm sorry. Because it's not in the list. Your theory is they can't consider anything that is in the list, so they should never consider your IME report that contradicts the evidence of disability that was set forth by the treating medical records. Well, the PPD, the impairment report, it's in subsection A. You have IMEs many times that come in, not the preparers of the PPD report. You have IMEs that come in and say, wait a minute, this man didn't have a bulging disc. He had a strain. We disagree with number five says evidence of disability corroborated by the treating medical records. So I guess you can't take anything that contradicts the treating medical records into consideration, can you? Well, I mean, I don't think that you have that situation presented in this case. Can I ask you a question? I don't know that this is that case. Because the answer to the question when you answer it is going to disprove your thesis that they can't consider anything but these five factors. They've got to consider any relevant evidence in the record, but they must consider these factors. It doesn't say they can't consider anything else. And to suggest that it does would remove from the consideration of the commission probably 50% of the evidence they hear. You can't have it both ways. Well, I'm looking at what it is that the legislature said, what PPD determinations were going to be. Would you actually like us to write an opinion that says that they cannot consider any evidence other than the evidence that supports these factors, including defense IME reports that contradict treating physicians' opinions? Would you like us to write that opinion? Well, I don't think you have that. I don't think your insurance company would like that. I don't think you have that presented in this case. So, I mean, I don't know that you can make it. You made a statement, ma'am, and what I'm trying to do is convey to you that your statement is just simply wrong. They've got to consider no question they must consider these. But to suggest that this statute says that's all they consider is just simply not right. And I think when you're looking at other issues in a case, because obviously it's not always solely a PPD determination. There's evidence coming in for other issues. There might be an issue as to whether there was an accident in the course and scope. There's other issues in a case where there may be evidence that's coming in. But, yes, it is my position, it's my understanding from this amendment that PPD determinations are to be made based on these factors. And not only based on these factors, but how these factors relate to the level of disability. And so that's the other portion of it is that whatever that evidence is, it needs to relate to the level of disability. And you've come to that conclusion by reading the language that this amendment or this section anyway, right? Yes, Your Honor. I see. It sounds to me that you perhaps are going beyond the language. And are we permitted to do that? It's clear and unambiguous. I'm not sure how I'm going beyond the language. Well, you just told me what the intent of this section was, didn't you? Maybe I misunderstood. No, no, no. I think when you're looking at when a statute's been amended and previously there's never any method or standard for a PPD determination, and then I think when you change and make a specific list, make a method for a determination, I think that it's that change that shows the intent. So I'm not trying to go outside of the language of the statute, but I think that just in general, whenever you have an amendment that adds something in a situation like this, this is showing intent that they made a change that now PPD determinations are to be made based on these factors. But how about this for a novel idea? Wouldn't it have been better or simpler for legislature to put only these factors instead of having wild speculation over what they meant? If that was really their intent and they added the word only or exclusively these factors, we wouldn't be having this argument, would we? I mean, it also says that it shall be based on all of these factors, and the court's found that you don't have to have the PPD impairment report. I mean, I kind of see that as going along the same lines. You've previously been discussing one of the factors that is in the statute, and that was the claim to sage. And it just simply says the age of the employee at the time of the injury. There was evidence of the employee's age at the time of the injury. Right. So what was improper? How did the commission improperly consider that factor here? You're saying that they went beyond the statute in some way. I believe that when the commission is required to give the relevance and weight of any factor that's used in addition to the impairment level, that when they have to describe the relevance and weight, what I'm looking at first is what the relevance is. So what's the relevance of age for that specific level to basically raise the level or, you know? Why do you think the legislature put that in as a factor? What did they want the commission to consider relative to the employee's age? Well, whether or not the age has any relevancy to the level of disability, whether their level of disability. I mean, I'm assuming most factors are going to increase and make a greater level of disability. Does it also relate to how long logically the person will have to live with the disability? Is the person 25 or 65? Okay. Is it a controversial position to believe that a person who starts out at 25 with a disability versus somebody who starts out at 65, the person who's 25, as a matter of common sense, likely to have to live with that longer than the person who becomes disabled at 65? Is that illogical to you? It's not illogical. What I'm saying is that I think that you also have to look at the relationship with this section 1.1E, where they're saying it has to be based on evidence that's in the record. Well, his age is in the record, isn't it? His age is in the record, but there's nothing in there saying that he is going to live longer with his disability than someone who is older. That's not inferrable? That's not inferrable here? The commission can infer that, isn't it? Just as Justice Hudson said, isn't that what the legislature was aiming at? What other explanation is there for the commission to consider that factor? There may be a situation where the type of injury they had and the type of disability they had, actually, that age is a factor. And I think I gave, like, a hypothetical in my brief. I don't know if it's the greatest one or not, but perhaps someone with a brain injury, if you have a brain injury when you're older, you have evidence in the record that that person is going to be more likely to have some severe effects than someone who's had a brain injury when they're younger because of their age when they had it. They're going to have negative effects. So that's my thought on it directly impacts the level of disability. More than just saying, well, a person is at this age, so they're going to live longer. A person is older, so therefore it's going to be harder for them to live with it, so it raises it. Do you think that age impacts on his future earning capacity? If an injury happens, if a person loses a leg at age 25 and another person loses a leg at age 60, do you think the impact upon future earning capacity to the 25-year-old is greater than the impact on future earning capacity to the older gentleman? It certainly seems like it would. So you consider age in relation to earning capacity then, don't you? You could in that situation, yeah. Okay. So in other words, you infer certain things. People who are 25 have longer work lives than people who are 50. And so you have to infer certain things when you look at these. So what mistake did the commission make when it determined a factor based on his age? What did they do wrong? That there was nothing in the evidence that he's going to live longer with his disability. So are you saying that to put in mortality tables? It seems like you would need some evidence. To prove that a 25-year-old is likely to live longer than a 65-year-old. Right. Do you actually want mortality tables to establish that 25-year-olds live longer than 60-year-olds? I'm reading what's in the statute. You should never really try to defend the indefensible because it affects the remainder of your argument. If I could bring up another factor that I have an issue with, is that with regards to the future earning capacity, the commission had stated that his upper extremity impairment was going to make him more prone to future injury with an associated loss of income. And there was actually no evidence introduced that he was more prone to future injury. What about his testimony? That he's more prone to future injury. Well, he had more difficulty using the equipment. He did not feel he could perform his job. He still had physical problems. Doesn't that relate to the issue? Yes, that relates his testimony on that. I'm specifically talking about the assumption that he is more prone to future injury. You know, there's a problem. There's kind of a tension here, it seems to me, in the act. And with the commission, how the commission is made up, we've addressed that earlier in another case. You know, people representing different constituencies, so to speak, in the industrial sector of our state. But then we're to credit them with a certain level of expertise and knowledge in the area of the industrial context. So to some extent we deal with it like in judicial notice, but that's still a separate concept. So we're kind of imposing a lot of legalism, so to speak, on an administrative body, and that goes in terms of other agencies throughout the state, which are presumed to be able to make inferences or take notice of facts in the context. And so to what extent do we impose evidentiary requirements on that function? I'm just throwing that out because it does seem that you want mortality tables, evidence on this factor, evidence on that factor. I'm saying there's tension there. So you're saying that there are some things that clearly are outside the scope of this credited expertise of the commission that they require evidence on before they do that? I think that they require evidence when they're making the determination under Section 8.1B, that they're required to rely on evidence in the record or evidence that they've taken judicial notice of. I think that then when you're looking at the factors and you're getting to the point of looking at, okay, we've got evidence of these factors, what percentage are we going to give? I think that's where their expertise comes in. I mean, I understand your argument, and it has some intuitive appeal, but your interpretation, then, as Justice Hawkins pointed out, not only would the commission be precluded from considering nothing other than the technical list of factors, but you then, to further refine it, would say the commission then, in assessing the evidence, can make no common-sense, logical inferences either. It has to be heard. As you said with age, they can make no common-sense, logical inferences. How could they ever decide a case like that? I don't think I'm saying that they can't make any common-sense inferences. I think that was the argument with age. You have to have an actuarial table, mortality table, decide if a person 25 is likely to live longer than a person 65. You were saying they cannot use common-sense, logical inferences in assessing the evidence. You'll have time in the quire. We've let you build me on a little bit. Oh, I'm sorry. That's fine. All right. Thank you. Thank you. You will have five minutes in the quire. Counsel, you may respond. Good morning. May it please the Court, my name is Timothy Tackish, and I represent the Appellee and Petitioner, Mr. Fred Williams. Counsel. Justice Hoffman, in response to your question, the statute itself is not saying only. And, of course, the commission is not only allowed but prompted to use common-sense and logic. Otherwise, nothing would get done. You're saying they can consider factors other than those enumerated, and they can also use common-sense and logic in interpreting the evidence, correct? Exactly. Exactly, Justice. And, in fact, that was done in this case, and it was done repeatedly. There was initially a petition for review filed at the commission. It went before Judge Lopez at peril, was sent back to the commission for clarification, and the commission spent a great deal of time under the totality of circumstances. And certainly in terms of following the statute and the requirements of AB1 here, the five factors that were enumerated were each considered, and they were set out in considerable detail based upon the clarification by the commission. The impairment rating within the IME report, albeit the flawed IME report from Dr. Levin, was certainly considered. And in this particular case, the commission indicated that while the impairment rating was considered, so were the other four factors following AB1, including Fred Williams' age of 45, including Fred's occupation and the fact that it was heavy and physically demanding. And the commission did consider that and considered Fred's testimony, not only about the physical nature of what he had to do on a daily basis, but also what Fred was doing when he got injured. Fred was working with a 9-foot-long piece of steel, 2 inches wide, that weighed in excess of 400 pounds. It doesn't take a great deal of logic to figure out that that is a heavy and physically demanding act. Many of the facts in this particular case were not disputed. And, in fact, the fact that Fred had no preexisting problems involving his right arm or his right shoulder, that he's right-hand dominant, that there was absolutely no evidence in this case that not only Fred never had any complaints or problems with his right arm or right shoulder, but he never had any medical treatment. All the problems started at the time of this work accident. With respect to counsel, I think what the respondent and the appellant has been arguing over and over, with all these various appeals, is that there needs to be a vacuum approach here and that the only thing that should be considered or the greatest weight that should be placed in this particular case on permanency would be this IMU report from Dr. Levin. And that's simply not the case. There is a reason that the statute sets forth these five factors. And, of course, the commission is to take into consideration an individual's 45 will have. How do you respond to Justice Altman's question? If the list was exclusive and nothing and nothing but those factors were to be considered, how would the defense IMU report come in? Or would it come in? Well, only the impairment rating would come in. If it were given that strict an interpretation, all the other opinions, all the other factual files wouldn't come in. Absolutely. But we know very well that that is not the case. And, in fact, I cited the Continental Tire case because I believe that has a great deal of application here because in that particular case there is an IMU report. I shouldn't say an IMU report. There's an impairment rating by a treating doctor. Or, in fact, I should say a treating doctor indicated there was no impairment based upon his patient in Continental Tire, despite that fact, and based upon the other four factors besides the impairment rating. In Continental Tire, the patient and the petitioner was given permanency. And, obviously, there was a certain amount of logic that was followed in that particular case, and there certainly was deference given to the other four factors besides the impairment rating. And, really, that's what I've been arguing with all these particular appeals, and I think that's what the commission found, is the commission found in this particular case that, contrary to the respondent and the employer's argument, the impairment rating is not the end-all, be-all. Fred had a tough occupation. Fred was a young man. Fred had no problems with the right arm or right shoulder after he was discharged from the Marines all the way up until the time of this work accident. And, certainly, the commission took into consideration not only Fred's young age for purposes of future earning capacity, but also his activities of daily living. Fred testified, and I think it was corroborated within the treatment records also, that Fred had ongoing pain. He had ongoing limitations, even to the point of the last treating visit. And I would like to point out that, within the respondent's reply brief, they were correct, that I misstated something within the last office visit. Within the last office visit that Fred Williams had with Dr. Arabindi, the treating orthopedic surgeon, when the doctor released Fred to return to work without any restrictions, I incorrectly stated that there were 25-pound restrictions. That existed at the second-to-last visit. In fact, Dr. Arabindi, at the last office visit, released Fred without any lifting restrictions at all. But, at the last office visit with Dr. Arabindi, Dr. Arabindi had indicated elbow pain and had indicated that Fred still did not have full supination. In other words, he had not made a complete recovery, based on the last office visit in March of 2012. Two months later, at the IME with Dr. Levin, Dr. Levin not only noted Fred's ongoing complaints of pain, daily pain, constant numbness, the fact that Fred was still taking, two months after the last office visit, pain medication, narcotic pain medication. Fred had talked about, both to his own doctors as well as Dr. Levin, the fact that his ongoing symptoms caused him problems on a daily basis, gardening, playing with his grandchildren, playing golf. These were things that impacted Fred Williams' daily life. And that's one of the five factors that the Commission considered, when the Commission considered the totality of circumstances here. The Commission got it right. In fact, the only thing that's been disturbed, between all the appeals, was the original permanency award of 30 percent being reduced to 25 percent. There was a plethora of information that would support that. And respectfully, I think the Commission got it right here. Counsel, let me ask you a question in regards to one of the statutory factors, and that's future earning capacity. And the Commission's decision references something here that I'm not sure if they misspoke or if they meant to phrase it in the way that they did. It stated, we find that Petitioner's future earning capacity has been diminished and his upper extremity impairment makes him more prone to future injury with an associated loss of income. The words more prone to future injury, how do you interpret that? And if they truly meant that he was more prone to future physical injury, was there evidence of that in the record? Justice Harris, I believe there was evidence of that fact, not only based upon the fact that Fred had not made a full recovery at the last office visit with the treating orthopedic surgeon at the IME. There are objective findings by Dr. Levin of ongoing problems. Again, no full extension, no pronation. And Fred testified about what his activities required as a welder. Fred Williams testified not only that he spent most of his professional life as a welder, but also this was a hobby of his. This is a fellow that had welding equipment in his garage. Fred testified that although he didn't find out that he no longer had a job until the last office treatment with Dr. Arabindi, Fred tried to go back and tried to weld in his own garage and just said he couldn't do it. He also indicated during the examination with Dr. Levin, and Dr. Levin noted within the IME report that Fred did not believe that he could go back and perform welding. Based upon all these factors, Justice Harris, and again applying some logic and common sense here, some guy that is noted by two orthopedic surgeons, one treating, one examining, that he's got ongoing problems of numbness and pain on a daily basis, that he tried to do his lifelong occupation and couldn't do it with problems, it really doesn't take a great leap of faith to believe that this is a guy that, if he goes back to this type of welding, this type of strenuous, heavy physical activity, he's more prone to get injured than someone who would have made that full recovery, which just wasn't the case here. And the injury doesn't have to be to that limb or member, right? I mean, the fact that he's just more prone to, I mean, if he's numb, he's more prone to injury on anything, isn't he? Yes, sir, but in terms of the evidence that the commission had in this particular case, this is a right-hand dominant guy that otherwise had a perfectly normal limb up until he was injured here, but the treating records, coupled with this IME report, all indicate that this is a man that had ongoing problems on a daily basis, numbness, pain. How can someone lift this 400-pound piece of iron when he's got that condition that, by all evidence, he never recovered from? All right. Thank you, counsel. Thank you. Counsel, you may reply. Thank you. I don't think he was lifting the 400 pounds, but definitely working on it. What I would like to do is address another one of the factors, the evidence of disability cooperated in the treating records, and one of the issues that I have with the commission's decision on that was that they actually, yes, they had evidence from the treating record, but then they also referenced Dr. Levin's report, which is not the treating record. So I think that that information in a PPD impairment report is already taken into account when they make that medical level of impairment rating and what you're looking at within the section on cooperating, the disability should be confined only to what is actually in the treating medical record. So I think that it was error to consider that additional portion in that section when you're explaining the relevancy and weight. What I want to kind of point out on my point with the factors, I haven't really disputed as far as the occupation factor. I haven't laid that out in my briefs that I have any issue with, that it was a physically demanding occupation in his testimony about what he did. And I didn't raise that as a dispute or say that there was any error there. In my view, and I guess you'll tell me if I'm wrong on this, but if they only looked at that factor and still came up with the same figure, I don't think I would have any basis to say that, no, they can't say this, because I do think that it's within their, that's where I see the commission's expertise coming in, is what percentage they're going to give to that. But I do think that when you're looking at each of these factors, there needs to be a relevancy to the level of disability, and then obviously they explain the weight of each factor. But I think that there needs to be, it needs to all be coming from the record, because I don't think you can ignore Section 1.1e. And with that, I would respectfully request that you would reverse the circuit court and remand the case back to the commission to follow the guidance of the Section 8.1b. Thank you. Thank you, counsel, both for your arguments in this matter. We'll be taking our advisement. This position shall issue. We'll stand in brief recess.